**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RUBY ELAINE ROBERTS,**

     **Plaintiff,**

**v.**                     **Case No.: 3:12-cv-06138**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

## <u>MEMORANDUM OPINION</u>

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 15, 18). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   <u>Procedural History</u>

Plaintiff, Ruby Elaine Roberts (the "Claimant"), filed for DIB and SSI on October 13, 2009, alleging a disability onset date of September 8, 2009, (Tr. at 132, 139), due to

"severe depression, emotional and anxiety problems." (Tr. at 156). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 40-43, 60-75). Claimant filed a request for a hearing, (Tr. at 95), which was held on October 5, 2010 before the Honorable Caroline H. Beers, Administrative Law Judge ("ALJ"). (Tr. at 9-39). By decision dated January 10, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 47-59). The ALJ's decision became the final decision of the Commissioner on August 8, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On October 2, 2012, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on January 2, 2013. (ECF Nos. 12, 13). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 15, 18). Accordingly, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 58 years old at the time of her alleged disability onset. (Tr. at 132). She is a high school graduate and communicates in English. (Tr. at 18). Claimant has prior work experience as a mortgage loan officer. (Tr. at 158). Claimant's husband and mother both passed away in 2007, after which her alcohol abuse and symptoms of depression increased. (Tr. at 238, 339, 409).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical

and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id. §*§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

When a claimant is found disabled and there is medical evidence of drug addiction or alcoholism, the ALJ must conduct a further evaluation to "determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." *Id.* §§ 404.1535(a), 416.935(a). The key issue in making this determination is whether the claimant would still be found disabled if she stopped using drugs or alcohol. *Id.* §§ 404.1535(b)(1), 416.935(b)(1). In making this determination, the ALJ will "evaluate which of [the claimant's] current physical and mental limitations ... would remain if [she] stopped using drugs or alcohol and then determine whether any or all of [her] remaining limitations would be disabling." *Id.* §§ 404.1535(b)(2), 416.935(b)(2). If a claimant's remaining limitations would not be disabling, then her addiction is considered a contributing factor material to the determination of disability, *id.* §§ 404.1535(b)(2)(i), 416.935(b)(2)(i), and the claimant is not considered disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(2)(C). If a claimant's remaining limitations are still disabling, then the claimant is considered "disabled independent of [her] drug addiction or alcoholism and [the ALJ] will find that [the claimant's] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(ii), 416.935(b)(ii).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2013. (Tr. at 49, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 8, 2009, the

alleged disability onset date. (Tr. at 50, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of alcohol addiction and dependence and depression. (*Id.*, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments, when including her substance use disorder, met sections 12.04 and 12.09 of the Listing. (Tr. at 50-51, Finding No. 4).

The ALJ then considered whether Claimant's substance use was a contributing factor material to the determination of disability. (Tr. at 51-58, Finding Nos. 5-13). The ALJ determined that even if Claimant were not using substances, she would still have a severe impairment or combination of impairments, (Tr. at 51, Finding No. 5), but the impairments would not meet or medically equal any of the impairments contained in the Listing. (*Id.*, Finding No. 6). The ALJ found that if the Claimant stopped the substance use, she would have moderate restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties regarding concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 51). Consequently, the ALJ determined that absent substance abuse, Claimant had the RFC to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant could perform simple tasks consistent with the SVP 2 entry level work, as defined by the *Dictionary of Occupational Titles*; make simple work-related decisions with few work place changes; and maintain occasional interactions with supervisors, coworkers, and general public.

(Tr. at 52-57, Finding No. 7). The ALJ concluded that even if Claimant refrained from alcohol, she would still be unable to perform past relevant work. (Tr. at 57, Finding No. 8). Consequently, the ALJ then reviewed Claimant's past work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 57-58, Finding Nos. 9-12). The ALJ considered that (1) Claimant was born in born in 1951 and was defined as an individual of advanced age; (2)

she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 57, Finding Nos. 9-11). Given these factors, Claimant's RFC when not abusing alcohol, and the testimony of a vocational expert, the ALJ determined that Claimant would be able to perform various occupations that exist in significant numbers in the national and regional economy. (Tr. at 57-58, Finding No. 12). At the medium level, Claimant could work as a hand packager, laundry worker, or dining room attendant; at the light level, Claimant could function as an office helper or price marker; and at the sedentary level, Claimant could perform jobs such as assembler or grader/sorter. (Tr. at 58). Inasmuch as Claimant would not be disabled absent her substance use disorder, the ALJ determined that substance use was a contributing factor material to the determination of disability. (Tr. at 58, Finding No. 13). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 59).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises three challenges to the Commissioner's decision. First, Claimant argues that the ALJ improperly assessed her credibility. (ECF No. 15 at 8-10). Second, Claimant asserts that the ALJ failed to consider all of the Prestera records in determining her RFC without not using alcohol. (*Id.* at 10-11). Third, Claimant contends that the ALJ failed to accord adequate weight to the opinion of Claimant's treating provider, Laberta Salamacha. (*Id.* at 11-12).

## V.    <u>Relevant Medical Records</u>

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

#### 1. *Hospitalizations and Pre-Onset Treatment Records*

Between November 2007 and December 2008, Claimant received ongoing mental health treatment from David Humphreys, M.D. (Tr. at 360-77). Between October 2007 and July 2009, Claimant also received intermittent medical care from Shelley R. Bailey, M.D. (Tr. at 227-28, 401-03, 408). During that time, Claimant reported suffering from severe grief related to the passing of her husband and mother. (Tr. at 360-77). Claimant also struggled with alcohol abuse, for which she was hospitalized on several occasions. (Tr. at 227-28, 237-79, 321-35, 339-48, 360-77, 401, 403). On June 23, 2008, Claimant reported that she had undergone inpatient detoxification at River Park Hospital. (Tr. at 368).

On September 2, 2008, Claimant was involuntarily admitted to St. Mary's Medical Center after her daughter "found the patient drunk and looking for her gun." (Tr. at 257, 363). Claimant's history and physical examination indicated that she had been admitted to River Park Hospital on three prior occasions for inpatient "detox from alcoholism and also from her depression." (Tr. at 258). Claimant's diagnosis was "major depressive disorder, not otherwise specified" and "alcohol abuse, addiction and dependence," and she was assessed a GAF scoreof 40, with her highest score in the past year being 80.[1]  (Tr. at 261). During her 10-day inpatient treatment, Claimant admitted that she had recently

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score indicates a less severe impairment. For example, a GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). A score of 80 suggests only slight impairment and transient symptoms. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool.

been drinking 9-12 ounces of vodka per evening, and that she drank an "eye opener" in the morning, which involved putting alcohol in her coffee to prevent and postpone withdrawal symptoms. (Tr. at 238, 264). While hospitalized, Claimant attended individual, group, and recreational therapies, and upon discharge was encouraged to attend AA meetings and follow up with Dr. Humphreys. (Tr. at 242). Claimant's diagnoses at discharge were "major depressive, recurrent and severe," "alcohol dependence," and grief. (Tr. at 243). Claimant was assigned a GAF score of 65 on discharge.[2] (Tr. at 244).

On March 2, 2009, Claimant was voluntarily admitted to River Park Hospital for alcohol detoxification. (Tr. at 339-48). During intake, Claimant reported that she had a history of alcohol abuse for the past 10 years, which became worse following the passing of her husband and mother in 2007. (Tr. at 339). Claimant reported "that over the last couple of weeks she has been drinking a pint of liquor about every couple of days" and that the previous day she drank a pint of liquor before work, left work early, and then drank another pint of liquor in her car. (*Id.*). Claimant reported feeling very depressed with thoughts of hurting herself. (*Id.*). This was her fourth admission to River Park Hospital. (*Id.*). Claimant was diagnosed with "MDD recurrent severe" and "alcohol dependence," assigned a GAF score of 40 to 45,[3] and began alcohol detox. (Tr. at 340-41). Following a full physical, Claimant was assessed with "depression with suicidal ideation" and "alcohol abuse and withdrawal" (Tr. at 344). Upon discharge on March 12, 2009, Claimant had "made progress with addressing depression and alcohol dependency" and

---

[2] A GAF score of 61-70 indicates the presence of some mild symptoms, but the client is generally functioning pretty well and has some meaningful interpersonal relationships.

[3] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

stated that "medication changes have been very helpful to patient." (Tr. at 345). Claimant's GAF score on discharge was assessed at 65. (*Id.*).

On July 14, 2009, Claimant reported to Dr. Bailey that she was drinking "some but not as much as before," which still included at least one mixed drink per day. (Tr. at 401). Dr. Bailey diagnosed Claimant with Alcohol abuse, anxiety, and depression, but noted that Claimant had not seen her counselor for 7 or 8 months. (*Id.*). This is consistent with Dr. Humphrey's final treatment note dated February 23, 2009, indicating that Claimant did not keep her appointment. (Tr. at 359).

On September 9, 2009, the day after Claimant's alleged disability onset date, she was voluntarily admitted as an inpatient at River Park Hospital, following a relapse after three weeks of sobriety. (Tr. at 321-26). Claimant "admitted drinking constantly to the extent that she is always sleeping and forgets about herself" and reported drinking "about half a pint of vodka everyday." (Tr. at 321). Claimant also reported feeling hopeless and helpless, missing her deceased husband, missing work and having low energy, suicidal thoughts, poor sleep, poor appetite, and isolating herself. (*Id.*). Claimant was initially assessed with "alcohol dependence with major depression," (Tr. at 325) and "put on alcohol detox, which was completed successfully, without any complications." (Tr. at 321). During hospitalization, Claimant "generally improved and her mood was good, and she was not suicidal or psychotic." (*Id.*).

At the time of discharge, Claimant's attending physician, Shafiq Nusrat, M.D. observed that Claimant's mental status exam was within normal limits or otherwise appropriate as to her orientation, mood, affect, thoughts, thought content, speech, eye contact, psychomotor activity, and memory. (Tr. at 323). Claimant reported that she was still having problems with sleep, but felt "that she can work that out with her outpatient

psychiatrist." (*Id.*). Claimant's insight and judgment were also improving. (*Id.*). At discharge, Claimant was diagnosed with "major depressive disorder, recurrent, mild to moderate, improving," "alcohol dependence," and "complicated bereavement," and assessed a GAF score of 55.[4] (Tr. at 321).

### 2. Post-Onset Treatment Records

On September 28, 2009, Dr. Nusrat provided a Certification of Health Care Provider. (Tr. at 329-31). Dr. Nusrat stated that Claimant "had multiple admissions for recurrent depression, including recent one on 9/9/09, in the last 2 years, which points that patient's condition is becoming more chronic in nature," and that Claimant needed extensive outpatient treatment in order to better function at work. (Tr. at 329). Dr. Nusrat indicated that Claimant required 6-8 weeks away from work so that she could "work on her emotional issues to prevent future severe relapse," as Claimant "most likely is suffering from emotional problems which may affect work performance." (*Id.*). There was no discussion of Claimant's alcohol dependency issues.

Between October 2009 and December 2009, Dr. Bailey met with Claimant and managed her medication. (Tr. at 387-89). During this time, Claimant denied alcohol use, but reported feeling depressed and crying. (Tr. at 387-88, 391). On November 19, 2009, Claimant reported "feeling better since start[ing] Prozac but still getting really depressed." (Tr. at 388). Dr. Bailey also wrote notes requesting that Claimant be excused "from work while she seeks treatment for chronic depression." (Tr. at 280-81).

On December 28, 2009, Claimant began mental health treatment at Prestera Centers. (Tr. at 409-23, 435-37, 465). During intake, Claimant reported "that her

---

[4] GAF scores between 51 and 60 indicate "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

symptoms of severe depression began when her husband passed in 2007" and "that she previously abused alcohol to self-medicate." (Tr. at 409). Claimant reported that she "does not experience any difficulty with activities of daily living" and that she "enjoys cooking, spending time with friends, and going to the movies." (Tr. at 409, 411). Claimant was diagnosed with "Mood Disorder NOS" and assigned a GAF score of 60. (Tr. at 412, 422). Claimant's mental status exam reflected that her attention span was distractible and she was impulsive, mood was depressed and anxious, affect was tearful, and she reported experiencing insomnia and suicidal ideation. (Tr. at 465). Her hygiene, posture, gait, sensorium, attitude, eye contact, appetite, intellectual functioning, and thought content were within normal limits or otherwise appropriate. (*Id.*).

In January 2010, Claimant recounted her recent history of depression and alcohol abuse, and stated that "she feels at a loss at times but is able to recognize that it is important for her to do what she needs to do, including use of healthy coping skills." (Tr. at 468-70). Claimant's mental status was within normal limits or otherwise unremarkable. (Tr. at 468, 470). In February 2010, Claimant reported that she had "been to Depression Group and that she enjoyed it and plans on returning." (Tr. at 471). Treatment notes also indicate that "Client want[ed] to continue with group therapy only" at that time. (*Id.*). Claimant's mental status exam was within normal limits. (Tr. at 471). In March 2010, Claimant reported "feeling very depressed" but that her sleep was good. (Tr. at 463).

On April 7, 2010, Prestera clinician Cheryl Hinshaw conducted a 3-month assessment of Claimant. (Tr. at 424-31, 461-62). Claimant's mental status examination reflected that her orientation, speech, appearance, thought content, and sociability were all within normal limits or otherwise appropriate. (Tr. at 429). Claimant had no history of

functional deficit as to school, activities of daily living, self-administering medications, or maintaining personal safety, and required only minimal assistance maintaining relationships "because she is withdrawn". (Tr. at 429-430, 462). Claimant reported that "[s]he might get a bottle of vodka but hasn't drank since September." (Tr. at 461). Claimant stated that she had "tried to work in the last two years but it is so stressful and can't handle it," and that she "ends up crying or not coming to into work." (*Id.*). Other symptoms Claimant reported included: anxiety, crying, decreased interest/motivation, impulsiveness, difficulty concentrating, and unusual appetite. (Tr. at 461-62). However, Claimant reported that the "last time she had a panic attack was about a year ago," she "denie[d] suicidal or homicidal ideations in the last 3 months," and reportedly sleeps about 5 hours per night. (*Id.*). Accordingly, Ms. Hinshaw concluded that Claimant should "continue Low End services with seeing physician for med reviews and CM for diagnostic assessment every 6 months or as needed." (Tr. at 430, 462). Ms. Hinshaw further noted that Claimant "[r]efuses other services at this time." (Tr. at 430). Claimant was diagnosed with "major depressive disorder recurrent, moderate" and assigned a GAF score of 60. (Tr. at 430-31).

In May 2010, Claimant reported that she "still has some anxiety and depression" but experienced no crying spells or side effects of medication, and that she was "sleeping good." (Tr. at 501). In July 2010, Claimant reported feeling less anxious and depressed, but that she was not sleeping well. (Tr. at 491). In September 2010, Claimant reported feeling frustrated, as she was still not sleeping well. (Tr. at 503).

In a psychiatric evaluation dated November 8, 2010, Claimant reported that she was still having problems with depression and relayed her history of alcohol dependence, but stated that she was now sober. (Tr. at 433). Claimant's mental status exam reflected

that her mood was restricted while her affect was congruent with her mood. (Tr. at 434). However, her appearance, motoric behavior, attitude, thought content, thought process, sensorium, perception, memory, concentration, intelligence, and insight and judgment were all observed to be within normal limits or otherwise appropriate. (Tr. at 433-34). Claimant was diagnosed with "MDD, recurrent, moderate," and assigned a GAF score of 50-55. (Tr. at 434).

## B.  Medical Evaluations and RFC Assessments

### 1.  Agency Assessments

On January 7, 2010, Emily E. Wilson, M.A. provided a mental evaluation of Claimant consisting of a clinical interview and a mental status examination. (Tr. at 438-42). During the interview, Claimant reported experiencing symptoms of depression dating back to 15 years prior, which became much worse two years prior. (Tr. at 438-39). Claimant also reported symptoms of anxiety beginning several years prior. (Tr. at 439). Ms. Wilson reviewed Claimant's September 2009 River Park Hospital records. (*Id.*). Claimant admitted having "a problem with alcohol in the past," but reported that she has not drunk any alcohol since September 2009 and that she "finally know[s] now it's not the way to go." (Tr. at 440). Claimant also reported "that she performs most activities of daily living independently," including tasks such as grooming, hygiene care, cleaning, cooking, driving, shopping, managing her finances, reading, watching movies, and going to the public library to check out books and movies. (*Id.*).

Claimant's mental status exam was essentially within normal limits as to her appearance, attitude/behavior, orientation, speech, mood, affect, thought process, thought content, perception, insight, judgment, memory, concentration, psychomotor activity, social functioning during the evaluation, pace, and persistence. (Tr. at 441).

Claimant also denied suicidal/homicidal ideations. (*Id.*). Accordingly, Ms. Wilson's Axis I diagnosis for Claimant consisted of "major depressive disorder, recurrent, mild" and "alcohol dependency, in early full remission, by Client report," based upon Claimant's reported symptoms and treatment history. (*Id.*). Ms. Wilson opined that Claimant's prognosis was "[g]ood if she is able to obtain consistent and appropriate psychological and psychotropic interventions." (Tr. at 442).

On January 22, 2010, Jeff Harlow, Ph.D. provided a psychiatric review technique of Claimant based upon Claimant's inpatient hospitalizations and outpatient treatment records, as well as Ms. Wilson's mental evaluation. (Tr. 443-55).  Dr. Harlow diagnosed Claimant with Major Depression, (Tr. at 446, 455), but concluded that it was not severe because Claimant did not demonstrate any degree of limitation in her activities of daily living; maintaining social functioning; or maintaining concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 453, 455). Dr. Harlow further observed that Claimant's "comments about functional capacities are externally inconsistent with clinical results of the consultative evaluation" and as such, were only "regarded as partially credible." (Tr. at 455).

On June 3, 2010, Paula J. Bickham, Ph.D. provided a case analysis of Claimant's mental impairments in light of Claimant's report "that she continues to have mood issues and receives medication for these issues." (Tr. at 483). After reviewing all of the evidence in the file, Dr. Bickham "affirmed as written" Dr. Harlow's January 2010 evaluation. (Tr. at 483). In particular, Dr. Bickham observed that a "recent mental status exam of 4/7/10 indicate[d] that her cognitive and social functioning is within normal limits." (*Id.*).

### 2.  *Other Assessments*

On November 19, 2009, licensed psychologist Cheri Ziegler, M.A. provided a

mental status exam and RFC opinion regarding Claimant. (Tr. at 313-17). Ms. Ziegler explained that Claimant was referred to her following discharge from St. Mary's Medical Center, and that she attended intake and one therapy session in March 2009. (Tr. at 313). Claimant's mental status exam, as of March 9, 2009, reflected that her mood was depressed, affect was restricted, and judgment and insight were mildly deficient. (Tr. at 315). Otherwise, Claimant's orientation, speech, delusions, hallucinations, suicidal/homicidal ideations, perception, thought content, and psychomotor activity were all within normal limits or otherwise appropriate. (*Id.*). Ms. Ziegler further explained that Claimant's "insight and judgment were mildly deficient based on her minimizing the alcohol dependence." (*Id.*). Accordingly, Ms. Ziegler opined that Claimant's social functioning was mildly deficient, but her task persistence and pace were normal based upon clinical observations. (Tr. at 316). Memory and concentration were not tested. (*Id.*). Ms. Ziegler diagnosed Claimant with "major depressive disorder, recurrent, moderate" and "alcohol dependence, early full remission," and assigned her a GAF score of 60. (Tr. at 317). Additionally, Ms. Ziegler observed that Claimant "has problems functioning on a day to day basis in her home, with her daughter, and on the job when she is drinking alcohol." (*Id.*).

On September 1, 2010, Laberta S. Salamacha, M.A. provided a psychological evaluation and a mental RFC opinion of Claimant. (Tr. at 495-99, 511-14). The psychological report consisted of a clinical interview, mental status exam, and intelligence testing.[5] (Tr. at 511-14). Regarding past mental health treatment, Claimant reported ongoing symptoms of depression and anxiety, and told Ms. Salamacha "that she has been

---

[5] Although Ms. Salamacha's report indicates that her assessment also included a review of records, the report contains no reference to any such review, nor are any records referenced in support of her RFC opinion. (Tr. at 511).

admitted to River Park Hospital approximately five times and admitted to St. Mary's Hospital once due to her depression symptoms." (Tr. at 511). Regarding her substance abuse history, Claimant reported "that she has a history of alcohol dependency, however, she denies of any alcohol dependency at this time." (*Id.*). Claimant reported that she had attended AA meetings in the past, but that they were not helpful, and that she "believes she drank to self-medicate due to her depression." (Tr. at 511). Regarding her activities of daily living, Ms. Salamacha noted that Claimant attends to self-care, performs household chores including cooking and cleaning, cares for her two pet dogs, drives and goes grocery shopping as needed, reads and watches movies, and goes to the public library frequently. (Tr. at 512). Claimant's mental status exam reflected that her affect was "overall dysphoric and she was tearful during most of the interview," but otherwise her appearance, social interaction, thought content, perception, and insight were within normal limits or otherwise appropriate; Claimant had problems with attention and concentration; her immediate memory was poor, but her recent and remote memories were generally intact; and her judgment was observed as good, but appeared to have been impaired at times in the past. (Tr. at 512). Claimant denied suicidal and homicidal ideations, but admitted being suicidal on numerous prior occasions. (*Id.*). Claimant's MMPI-II socio-emotional assessment was consistent with her current mental status and recent mental history, as Ms. Salamacha observed that "[s]ymptoms of major depression [were] evident" and "[s]he may be isolating herself socially and having feelings of inadequacy." (Tr. at 514). Claimant's WAIS-IV intellectual assessment reflected a Full Scale IQ score of 86, corresponding with an average classification of intelligence. (Tr. at 513). Claimant's WRAT-4 achievement assessment corresponded with grades 12.5, 12.0, >12.9, and 9.8 equivalence in reading, sentence comprehension, spelling, and math, respectively, and

were "primarily consistent with her currently assessed intellectual functioning." (*Id*.).

Ms. Salamacha diagnosed Claimant with "major depressive disorder, recurrent, moderate to severe," "bereavement," and "history of alcohol abuse in reported full remission." (Tr. at 514). Ms. Salamacha noted that Claimant's "signs and symptoms of major depression and anxiety . . . have been severe and persistent for approximately the last 3 years" and that "she has been hospitalized 6 times in psychiatric facilities." (*Id*.). Ms. Salamacha further stated that "[d]ue to the severity of [Claimant's] major depression and anxiety it is my opinion that she could not obtain or maintain gainful employment." (*Id*.). Ms. Salamacha then advised continued psychiatric care and psychotherapy to assist Claimant in managing her grief, chronic depression and anxiety, and setting boundaries with her daughter "who is also having mental health issues and bereavement." (*Id*.).

In her RFC opinion, Ms. Salamacha opined that Claimant was subject to multiple limitations as a result of her mental impairments. (Tr. at 497-99). Claimant had "poor" ability to maintain attention and concentration for extended periods; to perform activities within a schedule or maintain regular and punctual attendance; to complete a normal workday or workweek; and to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 497-98). She had "fair" ability to understand, remember, and carry out detailed instructions; to sustain an ordinary routine without special supervision; to work with or near others without being distracted by them; to perform at a consistent pace; to interact appropriately with the public; to ask simple questions or request assistance; to get along with co-workers and peers; to maintain socially appropriate behavior; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (*Id*.). Ms. Salamacha opined that Claimant had "good" ability to

perform all other work-related tasks, which included ability to remember locations and work-like procedures; to understand, remember, and carry out short, simple instructions; to make simple work-related decisions; to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions. (*Id.*). Ms. Salamacha indicated that the opinions contained in her assessment were supported by her review of Claimant's history, mental status exam, WRAT-4, WAIS-IV, and MMPI-2, but did not elaborate further. (Tr. at 498). Ms. Salamacha further opined that no other capabilities were affected by Claimant's impairments. (Tr. at 499).

## VI.  **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled

is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered all of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

### A. Determination of Claimant's Credibility

Claimant contends that the ALJ improperly assessed her credibility. (ECF No. 15 at 8). Claimant argues that the evidence, including her Prestera treatment records, the opinion of Ms. Salamacha,[6] the consistency of Claimant's own statements, and the fact that Claimant actively sought treatment for both depression and alcoholism, bolster the credibility of her statements regarding the severity of her functional limitations after ceasing alcohol use. (*Id.* at 9). In contrast, the Commissioner argues that the ALJ specifically considered Claimant's Prestera treatment notes, Ms. Salamacha's evaluation, and the remainder of the administrative record, properly weighed the evidence and found Claimant's statements of disabling depression to accurately describe her status when abusing alcohol, but to exaggerate the extent of her mental impairments when abstaining from alcohol. (ECF No. 18   at 13-14). Having carefully reviewed the ALJ's credibility assessment, the Court agrees with the Commissioner.

---

[6] Although Claimant refers to Ms. Salamacha as a doctor, (ECF No. 15 at 9), the record reflects that she is a masters level psychologist. (Tr. at 497, 514).

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.*   §§ 404.1529(a), 416.929(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. *Id.* §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic

techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5.

> In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:
>
>> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the

claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at 7. However, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not simply replace its own credibility assessments for those of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d. at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)).

Here, the ALJ provided a detailed overview of Claimant's testimony, which the ALJ compared against the relevant medical evidence, consultative evaluations, and other statements made by Claimant in order to assess her credibility. (Tr. at 56-57). As the ALJ observed, Claimant's testimony of disabling symptoms was inconsistent with her testimony regarding activities of daily living, as well as her function reports, both of

which indicated a wide range of daily activities. (Tr. at 17-18, 56-57, 153-71, 183-90). Treatment records from Prestera were also inconsistent with Claimant's report of debilitating symptoms, as she was twice assigned a GAF score of 60. (Tr. at 422, 431). Likewise, agency evaluations by Ms. Wilson, Dr. Harlow, and Dr. Bickham support the ALJ's credibility determination, as they reflect only mild impairment. (Tr. at 438-56, 483). Dr. Harlow explicitly concluded that Claimant's "comments about functional capacities are externally inconsistent with clinical results of the consultative evaluation, [and] are regarded as partially credible." (Tr. at 455).

The ALJ conducted a thorough analysis of the relevant evidence, weighed the medical source opinions, and provided a logical basis for discounting the credibility of Claimant's statements regarding her depression post-detoxification and while abstaining from alcohol. It is clear from the written opinion that the ALJ did not entirely disregard Claimant's descriptions of her depression. The ALJ acknowledged that Claimant's depression, even when she was not drinking, continued to be a severe impairment that prevented her from performing past relevant work and resulted in certain limitations on her ability to perform other employment. However, the ALJ relied upon persuasive objective evidence that demonstrated a significant improvement in Claimant's mental status and function with alcohol cessation, which Claimant simply refused to concede. For that reason, Claimant's statements were considered less than credible.

In addition, the errors Claimant assigns to the ALJ's credibility determination are meritless. First, Claimant questions whether the ALJ reviewed the Prestera treatment records dated after May 2010. (ECF No. 15 at 9). On July 12, 2010, Claimant reported "feeling less anxious and depressed, but not sleeping good," and experiencing "no side effects of medication." (Tr. at 502). On September 13, 2010, Claimant reported that she

was "feeling frustrated, still not sleeping good" and that she "want[ed] to take another medication." (Tr. at 503). On November 8, 2010, Claimant stated that she still had "problem depression," but her appearance was clean and neat; her behavior was calm; her attitude was cooperative; her thought process was clear; she was fully oriented; her memory was intact; her concentration was good; and her insight was fair. (Tr. at 433-34). Claimant was noted to have a restricted mood and affect, but her depression was described as "moderate" and her GAF was 50-55. These treatment notes neither bolster Claimant's credibility nor diminish the ALJ's determination in any discernable way.

Second, Claimant argues that the ALJ failed to properly consider Ms. Salamacha's MMPI-2 findings regarding Claimant's symptoms. (ECF No. 15 at 9). Although Ms. Salamacha described characteristic symptoms and attributes for individuals with MMPI-2 scores similar to Claimant's, Ms. Salamacha's only observation specific to Claimant was that her "current mental status and recent mental history" were "consistent" with the prototypical individual. (Tr. at 514). Ms. Salamacha added a disclaimer, however, remarking that "the inferences and descriptions presented should be combined with other sources of information, as individuals may not fully match the prototypes." (*Id.*). In fact, the inventory results were inadequate to reveal a precise MMPI-2 code for Claimant, so a scale-by-scale interpretation had to be performed by Ms. Salamacha. When considering Ms. Salamacha's opinions, the ALJ found the weight of her evaluation to be significantly diminished in light of her role as an "advocate" and given that her opinion appeared "to be based on the claimant's self-report and not on the treatment notes from the hospitalizations she has had." (Tr. at 55). Of particular importance to the ALJ were Ms. Salamacha's descriptions of Claimant's hospitalizations as being for mental health treatment, rather than for alcohol abuse and detoxification, as well. (*Id.*). Thus, instead of

bolstering Claimant's credibility, Ms. Salamacha's report made it appear as though Claimant withheld information regarding the substantial role her alcohol abuse had played in her mental health hospitalizations.[7]

Third, Claimant asserts that a longitudinal review of her treatment record supports a positive credibility finding, as her own statements have been consistent throughout her period of sobriety, and because she actively sought treatment for both alcohol use and depression. (ECF No. 15 at 12-13). However, the undersigned observes that in July 2009, less than two months prior to her alleged disability onset date, Claimant reported to her physician that she was drinking "at least 1 mixed drink/day," and had last seen her counselor 7-8 months prior. (Tr. at 401). Additionally, Claimant's Prestera treatment notes reflect that as of February 2, 2010, Claimant "want[ed] to continue with group therapy only." (Tr. at 471). Likewise, a treatment note dated April 7, 2010 reflect that although Claimant agreed to "continue Low End services with seeing physician for med reviews and CM for diagnostic assessment every 6 months or as needed," she "[r]efuses other services at this time." (Tr. at 430). Moreover, a review of Claimant's records, beginning with the exacerbation of her symptoms in 2008, and continuing to her last visit at Prestera in November 2010, reveals marked improvement in Claimant's mental health during periods of sobriety. Thus, from a longitudinal perspective, the ALJ's conclusion that Claimant minimizes the impact of alcohol on her symptoms of depression, and therefore is not credible, is supported by substantial evidence.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

---

[7] Likewise, the undersigned notes Ms. Zeigler's November 2009 observation that Claimant's insight and judgment were "mildly deficient based on her minimizing the alcohol dependence." (Tr. at 315).

### B. Failure to Address Prestera Treatment Records

Claimant next argues that the ALJ "completely omitted mention of the Plaintiff's treatment records from Prestera, which spanned from December 2009 through September 2010." (ECF No. 15 at 10). This assertion is simply incorrect, as the ALJ included multiple citations to Prestera records throughout her decision.[8] If Claimant's objection is that the ALJ did not specifically discuss the content of each of Claimant's session notes, such a failure by the ALJ is inconsequential in this case.

Certainly, the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant. However, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. . ."). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-cv-20FL, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009). District courts, including those in this circuit, routinely apply a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste

---

[8] In determining whether Claimant's impairments including substance use, meet or equal a Listed impairment, the ALJ specifically referenced "[r]ecords from treating source Prestera (Exhibit 17F)." (Tr. at 51). The ALJ cited to Prestera records which "reflect that the claimant has a history of depression and anxiety for which she has been prescribed various medications without side effects." (Tr. at 52, citing 31F, 33F, and 34F). In assessing Claimant's RFC without alcohol use, the ALJ observed that "[t]he most recent records from treating source Prestera dated May of 2010 indicate that although the claimant had some anxiety and depression, she denied crying spells or side effects from medication, and she said she was sleeping good." (Tr. at 54). The ALJ accorded great weight to the state agency doctor opinions because their evaluations included a review of the Prestera records, unlike that of Ms. Salamacha. (Tr. at 56). The ALJ also relied upon Prestera assessments in support of her evaluation of Claimant's credibility. (*Id.*).

of time and money." *Jenkins v. Astrue,* No. 08-4078-JAR, 2009 WL 1010870, at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)); *see Morgan v. Barnhart,* 142 Fed. Appx. 716, 722-23 (4th Cir. 2005); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

Although it is true that the ALJ did not explicitly discuss each of the treatment notes from Claimant's therapy sessions, (Tr. at 468-72, 501-03), the ALJ did note that Claimant "was seen at Prestera beginning in January 2010 following being referred there after her last inpatient detoxification," and observed that "[t]reatment notes are scant but do not document much in the way of severe depression." (Tr. at 56). This characterization of Claimant's Prestera treatment notes is not inaccurate. In January 2010 and February 2010, Claimant's status exams were entirely unremarkable or otherwise within normal limits, and she reported enjoying group therapy sessions. (Tr. at 468-72). In March 2010, Claimant reported feeling "very depressed" but that she was "sleeping good." (Tr. at 463). As the ALJ noted, in May 2010, Claimant "still ha[d] some anxiety and depression" but "no crying spells, no side effects of medication" and she was "sleeping good." (Tr. at 501). In July 2010, Claimant reported difficulty sleeping, but otherwise felt "less anxious, depressed" and had "no side effects of medication." (Tr. at 502). In September 2010,

Claimant reported "feeling frustrated, still not sleeping good," and requested another medication. (Tr. at 503). In November 2010, Claimant continued to complain of "problem depression," but had a normal mental status examination. (Tr. at 433-34). She was encouraged to get involved in social activities and told to follow up in one month. These sporadic treatment notes simply do not reflect disabling limitations due to depression or anxiety. Rather, they are consistent with the other Prestera records that the ALJ cited in her decision, namely the January 2010 and April 2010 assessments conducted as part of an ongoing treatment plan for Claimant.

Accordingly, the Court finds that any error the ALJ may have made in failing to specifically address each Claimant's Prestera therapy session notes, was plainly harmless.

### C.  Weight Accorded to the Opinion of Laberta Salamacha, M.A.

Finally, Claimant argues that the ALJ "failed to accord adequate weight to the opinion of Laberta Salamacha, M.A." (ECF No. 15 at 11). Claimant asserts that Ms. Salamacha's observations of Claimant as "depressed and tearful" and having "difficulty with attention and concentration and was easily distracted," were consistent with certain uncited Prestera records, in which Claimant "reported symptoms including agitation, decreased energy, poor concentration, and distractibility" and was observed as "tearful, and her attention was distractible." (*Id.*). Accordingly, Claimant asserts that "[a] review of the entire case record shows Ms. Salamcha's opinions are consistent with the evidence of record." (*Id.*).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receive[s]." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). In the context of determining an individual's RFC, the ALJ must always consider and address medical source opinions, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 *7.

In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. *Id.* C.F.R. §§ 404.1527(e), 416.927(e). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions; they are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would,

in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[9] SSR 96-5p, 1996 WL 374183 *2. However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole.  *Id.*

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[10]

*Id.* at *3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). Ultimately, it is the responsibility of the ALJ, rather than the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in

---

[9] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183 *2.

[10]The applicable factors are now found at 20 C.F.R. §§ 404.1527(c), 419.927(c).

the written decision for the weight given to the opinions. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Here, the ALJ provided a well-reasoned explanation as to why she discounted Ms. Salamcha's evaluation and RFC opinion. (Tr. at 55-56). As the ALJ observed, Ms. Salamacha provided a one-time consultative examination and evaluation of Claimant, pursuant to a referral from Claimant's attorney. (Tr. at 511). Ms. Salamacha's relationship with Claimant was necessarily brief.  Moreover, Ms. Salamacha did not appear to have reviewed any of Claimant's medical or mental health records, as she was seemingly unaware that any of Claimant's prior hospitalizations at psychiatric facilities involved treatment for alcohol abuse and detoxification. (Tr. at 511-14). In the review of mental health treatment, Claimant reported "that she has been admitted to River Park Hospital approximately five times and admitted to St. Mary's Hospital once due to her depression symptoms," but did not mention the simultaneous alcohol abuse treatment or detoxification. (Tr. at 511). When specifically asked by Ms. Salamacha about substance abuse, Claimant evidently underrepresented the magnitude of her history of alcohol abuse and its impact on her mental health. Not surprisingly, the ALJ found Ms. Salamacha's diagnosis and corresponding RFC opinion to be unreliable to the extent they were based upon Claimant's misrepresentations of her mental health and substance abuse histories. (Tr. at 497-98, 514).

Despite giving "little weight" to Ms. Salamacha's opinion and "the greatest weight" to the findings of the state agency physicians, the ALJ nevertheless limited Claimant's RFC to performing simple tasks; making simple work-related decisions with few work place changes; and maintaining occasional interactions with supervisors, coworkers, and the general public, consistent with Ms. Salamacha's mental RFC opinion. (Tr. at 52, 497-

98). The undersigned regards the ALJ's RFC assessment as generous given that Ms. Salamacha's opinion of Claimant's functional limitations is inconsistent with both state agency RFC opinions, the consultative exam provided by Ms. Wilson, as well as Claimant's 2010 Prestera assessments.

Accordingly, the record unequivocally establishes that the ALJ fully considered Ms. Salamacha's RFC opinion, weighed it based upon the factors set forth in the regulations, and explained the reasons for affording it little weight. Thus, the ALJ followed the appropriate process, and her final assessment of Ms. Salamacha's opinion is supported by substantial evidence in the record.

## VIII. **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  August 26, 2013.

_____
Cheryl A. Eifert
United States Magistrate Judge